**SCROGGS v. AMERICAN STOVE CO.**

No. 8416.

Circuit Court of Appeals, Seventh Circuit.

May 11, 1944.

Rehearing Denied June 8, 1944.

298

Arthur L. Gilliom, Karl J. Stipher, Gilliom & Gilliom, and Elbert R. Gilliom, all of Indianapolis, Ind., for appellant.

James A. Ross and James Donadio, both of Indianapolis, Ind., for appellee.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

MAJOR, Circuit Judge.

This is an appeal from a judgment favorable to the plaintiff in an action predicated upon Secs. 2 and 3 of the Workmen's Occupational Diseases Act of Indiana, Chap. 69, Indiana Acts of 1937, Secs. 40-2202, 2203, 8 Burns' I.S.A., 1940, Repl. The Act permits the recovery of damages by an employe for injury to health by reason of disease contracted or sustained in the course of his employment, proximately caused by the negligence of his employer. Any violation by an employer of any law of the State, intended for the protection of the health of employes, is designated as negligence within the meaning of the Act. It is also provided that assumption of risk of the employment, negligence of fellow servants or contributory negligence of the employe shall not be a defense.

· The complaint alleged that plaintiff, while employed by defendant and as a result of the latter's negligence, contracted silicosis which developed into tuberculosis. The case was tried to a jury, and upon its determination of the issues in favor of the plaintiff, the judgment in controversy was rendered. Two propositions are urged for reversal: (1) There was no substantial evidence to support the charge of negligence, and (2) the erroneous admission of evidence.

Plaintiff was employed in defendant's stove and brass foundry, where he was engaged in operating certain machines and equipment and where it was alleged great quantities of dust containing silica was engendered which caused the injury to plaintiff's health. Defendant was charged with both common law and statutory negligence. The negligence alleged may be summarized: (1) Failure to provide a safe place to work; (2) failure to provide a sufficient means of ventilation; (3) failure to provide exhaust fans to carry off dust created by dust-creating machinery; (4) failure to provide respirators; and (5) failure to dampen sand and dust before sweeping, scraping and riddling, and failure to dump molds and riddle sand out of the presence of employes.

Defendant makes the mistake, so we think, so oftentimes made, of arguing the weight which should be given to the evidence. Such argument is properly directed to a jury, of course, but is of little consequence when made to a reviewing court. It is elementary that the question of negligence is one for the jury and that its determination is conclusive if there is any evidence, together with all reasonable inferences to be drawn therefrom, in support of the charge. Our function is limited to ascertaining if there is any such evidence, and in doing so we must consider the record in the light most favorable to the plaintiff.

Under these circumstances, we need only briefly summarize the evidence relied upon by the plaintiff. In doing so, we also think there is no occasion to discuss the evidence as it relates to all of the various acts of negligence charged, for. the reason that it is sufficient if any of such acts, either statutory or common law, are sustained by the proof.

Plaintiff, for a period of nearly thirteen years, worked as a molder either in defendant's brass or iron foundry, where sand was used for molds in which numerous casting forms were made. At the commencement of the trial, a stipulation was entered into by the parties which included the following:

"6. The moulding sand used by plaintiff and defendant's other moulders is a natural sand such as is commonly used in foundries for making moulds, and it contains particles of free silica which the defendant knew can be inhaled and result in a condition in the lungs known as silicosis."

The iron foundry room was 402 feet long by 182 feet wide, with ventilation provided by windows. The brass foundry room was 80 feet long by 51 feet wide, with ventilation provided by windows and two monitors. (A ventilator was provided for a furnace operated in this room.) It is hardly open to question but that large quantities of silica dust were continuously expelled in these rooms during the time of plaintiff's employment. At times it was so bad that the employes left the room to get air. In the iron foundry, a crew of laborers scraped dry sand from the molders' floors and runways into piles, without

dampening or wetting, which created dust. Dust was created by riddling this dry sand through a sieve and by dumping of molds. There was evidence that this dry sand could have been dampened, that the riddling and the dumping of the molds could have been done out of the presence of the employes. Also, there was evidence that the molds could have been conveyed by a conveyor system, dumped over a grate, and the dust exhausted by a down draft. It was shown that such methods are practical.

In the brass foundry, dust was created by the operation of a machine called a sand-cutter. This machine was power driven and consisted of a hopper into which molds were dumped. This machine operated at high speed and the sand was mixed and thrown with great force. Clouds of dust were caused by this operation, of such density that the workers were required to leave the room for air. There was evidence that his machine could have been isolated. The situation was called to the attention of a foreman, but the manager thought the expense would be too great and nothing was done about it. Ventilation in both foundries consisted of nothing more than the natural ventilation from the windows. An exhaust fan was suggested by plaintiff to defendant's superintendent, but again nothing was done on account of the expense. It was shown that numerous methods are possible and practicable for protecting the employes from the inhalation of dust. In the spring of 1939, two years before plaintiff became totally disabled, defendant sent him to an X-ray specialist for physical examination, and his condition then became known. Notwithstanding knowledge of this condition, he was permitted to remain at his employment until he became completely and permanently disabled.

■■ There is not the slightest doubt but that plaintiff contracted the disease complained of while employed by the defendant. We are satisfied that the question as to whether such contraction resulted from defendant's negligence was a question for the jury. We think, as was held in McBeth-Evans Glass Co. v. Brunson, 70 Ind.App. 513, 122 N.E. 439, under similar circumstances, that defendant knew, or by the exercise of ordinary care could have known, of the dangerous consequences likely to follow from plaintiff's exposure, and that by the exercise of ordinary care the situation resulting in such exposure could have been rectified or at any rate greatly improved. Also, in Illinois Steel Co. v. Fuller, 216 Ind. 180, 23 N.E.2d 259, the court, in response to defendant's argument (the same argument is made here) that its duty was discharged by providing window ventilation, 216 Ind. on page 190, 23 N.E.2d on page 264, stated:

"There was evidence that this was insufficient and that the situation could have been rendered less hazardous and the injury avoided by means of fans and glass enclosures which would not have impaired the efficiency of the plant. Since there was some proof to this effect, a question of fact was presented to the jury and it can not be said that there was a total lack of evidence to sustain the verdict."

Recently, this court in Rowe v. Gatke Corp., 7 Cir., 126 F.2d 61, affirmed a judgment for damages in favor of the plaintiff in an action to recover under the Occupational Diseases Act of Indiana. The facts are quite similar to those of the instant case, although it appears that they are more favorable to the defendant than are the facts of this case. We need not repeat what was there said. It is sufficient to note that recovery was allowed upon both common law and statutory negligence, and that three of such statutory provisions are also relied upon in the instant case.

■■ Defendant concedes that "negligence" referred to in the Occupational Diseases Act includes common law negligence. It insists, however, that under the rule of Indiana the ordinary care which it is required to exercise is measured by the care which prudent persons in like business exercise. Upon this premise, it is urged that there is no evidence that defendant has omitted any precaution which persons engaged in like business have exercised and that for this reason no common law negligence is shown. Some authorities are cited which apparently sustain this contention, but that it is the rule of Indiana appears to be refuted in Vandalia Coal Co. v. Price, 178 Ind. 546, 554, 97 N.E. 429, 432, wherein the court stated:

"This position is sustained by authority in many other jurisdictions, but the rule recognized in this state is that evidence of customary methods in general use is admissible, and such evidence should be considered by the jury, in determining the question of the particular negligence charged; but such evidence is not conclusive. (Citing Indiana cases.)"

It thus appears that failure on the part of a plaintiff to prove the customary methods in general use would not necessarily be fatal any more than proof by a defendant that it had followed such methods would conclusively relieve it of liability. After all, as we understand, the test is what a reasonably prudent person would have done under a similar situation rather than what some other person did or did not do. Furthermore, there is evidence in the instant case of practices adopted in the foundry industry for the protection of employes which were not used by the defendant.

■ The severest criticism as to this admission of evidence is directed at certain testimony of Dr. C. O. Sappington, who not only qualified as a physician but as a consultant in industrial medicine and industrial hygiene engineering. In this latter field he had had a wide and varied experience. Complaint is made of the answer to the following question:

"And should a sand cutter be operated, Doctor, considering the silicosis hazard that goes with this kind of an industry in the first place, without any exhaustion of the dust that comes from it?"

The question was objected to on the ground "that it asks for a conclusion and not for a fact." The question was answered thus:

"It can be so operated. I have seen them so operated where they were isolated and enclosed so that the only people that had anything to do with them were one or two men working around them or working with them and servicing them."

It is apparent that this answer was not responsive. No motion, however, was made to strike it on that ground or any other, and it appears that the answer was more favorable to the defendant than the plaintiff. Defendant's contention is predicated upon the premise of an answer, "that it should not be so operated." The answer complained of, however, was given in response to a later question, to which no objection was made. Under these circumstances, we are of the view that defendant is in no position to complain.

■ Defendant also criticises the testimony of this same witness as to "accepted safe" and "acknowledged safe" practices in iron foundries. As to the question with reference to the "accepted safe" practices, the only response made by the witness was that he could answer the question. We see no harm in this. As to the "acknowledged safe" practice, the witness answered:

"Yes, there are certain safe practices that are acknowledged to be in use and also acknowledged to be the right sort of practice from the standpoint of protecting the employe."

Defendant concedes that evidence of customary practices would have been permissible. While we think the question which resulted in this answer is subject to criticism, we also think it was harmless, especially in view of the fact that the witness testified in considerable detail, without objection, as to what was considered in the industry as safe practices.

■ Certain answers made by Drs. Reed and Henry are also complained of. The answers were in response to hypothetical questions and were to the effect that plaintiff contracted silicosis in defendant's plant. It is argued that these doctors were thus permitted to invade the province of the jury, whose function it was to determine where the ailment was contracted. Assuming that such questions were properly framed, and no contention is made to the contrary, we see no reason why the answers thereto were not in the legitimate field of expert testimony. Whether so or not, there is no prejudice in such testimony for the reason that the record leaves no doubt but that plaintiff's silicosis was contracted in the defendant's plant. As a matter of fact, the only question for the jury was whether such ailment was contracted as a result of defendant's negligence. This being so, we do not see how this testimony could have injured the defendant. Other testimony objected to is in the same category, and we think it is not necessary to consider it further. Under the circumstances of this case, we are satisfied that any error in the admission of evidence could not have affected the result. Cf. Rowe v. Gatke Corp., 7 Cir., 126 F.2d 61, 67.

We therefore conclude that the judgment should be, and it is,

Affirmed.